cise.   Courts, independent of statute, have the power to modify, vacate, and set aside its orders and judgments, and, while the award made by the commissioners was not an order or judgment of the court, yet it was made in a proceeding taken in the court, and is subject to the control of the court.   Weston v. City National Bank, 88 App. Div. 330–336, 84 N. Y. Supp. 743.   Whether the power to vacate an order or proceeding will be exercised in a given case is in the discretion of the court, and I think this case calls for the exercise of that power.   If the bridge had been swept away, it would be a harsh rule of law which would prevent the opening of the proceedings and the allowance of that fact to be shown.   The 30 days within which plaintiff might discontinue the proceedings has elapsed; and, unless the relief sought by this motion is granted, it may be that the proceeding would be hung up and the plaintiff unable to move backward or forward.

The objection is made that, as the Attorney General after the order of confirmation had been granted certified the value of the bridge to the comptroller and to the board of supervisors, his duties ended, and that he cannot be heard on behalf of the state to question the right of the bridge company to the payment of the award as fixed by the commissioners.   I think it follows from what has been suggested here, however, that, until the award has actually been paid, the power is vested in the court to protect the parties, and this independent of any of the provisions contained in the condemnation law of the state.

[5] Counsel for the state has asked that the order of confirmation be set aside and the commissioners permitted to make a supplemental report, fixing the damage to the bridge from the flood.   I think, however, if the matter is to be opened, a new appraisal must be made fixing the value of the bridge as of the time of' such appraisal.

An order will be made setting aside the order of confirmation and the award of the commissioners.   Counsel for the bridge company has suggested in his brief that, if such an order should be made, other commissioners should be appointed.   There is nothing in the papers presented to show the necessity for other commissioners.

The order may be settled on notice, and the counsel heard on the question suggested.

---

(156 App. Div. 351.)

ATLANTIC, GULF & PACIFIC CO. v. WOODMERE REALTY CO. et al.

(Supreme Court, Appellate Division, Second Department.   April 30, 1913.)

1. CONTRACTS (§ 285*)—ACTIONS—CONDITIONS PRECEDENT.

Where a contract for the filling of land and the excavation of a harbor provided for the settlement of any disputes by the city surveyor in that locality, the surveyor, having been engaged by defendant to represent its interests, is disqualified to act as arbitrator.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1290, 1291, 1303, 1304;  Dec. Dig. § 285.*]

2. CONTRACTS (§ 284*)—ACTIONS—CONSTRUCTION.

In an action on a contract for the grading of land and the excavation of a harbor, where there was no question of an engineering nature to be

determined, the determination of an engineer who was appointed arbitrator is not a condition precedent to the maintenance of the suit.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1292–1302, 1308–1310, 1312–1316, 1326–1338, 1340, 1342, 1344–1346, 1350, 1351; Dec. Dig. § 284.*]

3. CONTRACTS (§ 198*)—CONSTRUCTION.

Where a contract for the filling in of land and the excavation of a stream and harbor did not contain any guaranty on the part of the contractor of the character of the fill to be produced by dredging, and the contractor did not insure the stability of sod levees, the contractor cannot be held as an insurer of the stability of his work, for the owner might have ascertained the natural condition.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 861–877, 879–883; Dec. Dig. § 198.*]

4. CONTRACTS (§ 170*)—CONSTRUCTION—PRACTICAL CONSTRUCTION.

Where a contract for the grading of lowlands and the excavation of a stream and harbor did not include certain levees nor expressly require monthly payments for their construction, the practical construction of the parties in including such levees as part of the work and in making monthly payments will be held as expressing the true meaning of the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 753; Dec. Dig. § 170.*]

5. WORK AND LABOR (§ 14*)—PERFORMANCE OF CONTRACT—RIGHT TO RECOVER ON QUANTUM MERUIT.

Where a contract for the filling of land and the excavation of a stream and harbor required monthly payments, and the owner defaulted in those payments without giving any reason therefor, the contractor might at his election treat the nonpayment as a breach, and sue for the value of the work performed.

[Ed. Note.—For other cases, see Work and Labor, Cent. Dig. §§ 29–33; Dec. Dig. § 14.*]

6. CONTRACTS (§ 287*)—CONSTRUCTION—ENGINEER'S CERTIFICATES.

In the absence of a showing of fraud, accident, or obvious mistake, engineer's certificates of the amount of work done upon a grading contract are conclusive as to the amount of the work, and cannot be set aside upon a mere showing that, after the issuance of the certificates, the fill, which was upon marshy and soft ground, subsided.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1308, 1309, 1312–1316, 1318–1338, 1340–1342, 1344–1346, 1348, 1350, 1351; Dec. Dig. § 287.*]

7. PLEADING (§ 237*)—AMENDMENTS—AMENDMENT TO CONFORM TO PROOF.

In an action on a quantum meruit by a contractor to recover for labor in filling in defendant's lowlands to a specified grade, where the complaint did not set up any claim on the ground of the subsidence of the subsoil, statements by defendant's experts that after the filling the subsoil settled a given distance, being mere estimates, are too uncertain to authorize an amendment of the complaint to conform to the proof.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 603–619; Dec. Dig. § 237.*]

Appeal from Special Term, Nassau County.

Action by the Atlantic, Gulf & Pacific Company against the Woodmere Realty Company and another. Decree for plaintiff, and defendants appeal. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The following is the opinion of Putnam, J., at Special Term:

The Woodmere Realty Company is a domestic corporation owning property at Cedarhurst and Woodmere in the town of Hempstead, L. I. In 1910 it prepared plans to improve its meadow lands situate along Mills Creek, a small tidal stream that emptied into Woodmere Bay.

The territory to be developed included about 162 acres, subdivided by sectional lines into small squares. The excavation was to enlarge and deepen Mills creek, also to construct a basin for yachts; while above the first bridge was delineated a proposed canal running in a straight line northerly to Railroad avenue. The locations to be excavated, the canal, yacht basin, and margin of the bay, were marked "a. a." on the map; and the areas for deposit of material or the "fill" were marked "b. b."

The plaintiff company had been engaged in extensive dredging operations by hydraulic dredges, by which material in solution was pumped up from the bottom and discharged on the land through a line of pipe.

A written contract was entered into on January 13, 1910 (upon the basis of this map attached), in which the Woodmere Company was styled the owner, and the plaintiff the contractor.

The contract provided:

"First: The owner agrees to supply, and the contractor agrees to excavate and deposit on the fill, not less than one million (1,000,000) cubic yards of material on the property of the owner, at Woodmere, Long Island, and on the property of adjacent owners at Woodmere, or Cedarhurst, as shown on map hereto attached, and entitled, 'map attached to contract of January 13th, 1910, between Atlantic, Gulf and Pacific Company and Woodmere Realty Company,' showing approximate location of the dredging and filling to be done under that contract, also approximate location of canal to be excavated on the site of present Mills creek.

"It is understood, however, that the owner reserves the privilege to change the location of the waterways indicated on said map, on giving reasonable notice of such change or changes to the contractor.

"Second. The contractor agrees to put upon this work by February 1, 1910, weather and ice conditions permitting, a thoroughly equipped hydraulic dredge, and to proceed with the work at the rate of at least one hundred and fifty thousand (150,000) cubic yards, per month, dredging the material from areas marked (a), and depositing it on the areas marked (b), as shown on aforesaid map, and on such other parts of the property owned by the Woodmere Realty Company, or its grantees, lying within two thousand (2,000) feet from the point of excavation, but, nevertheless including the pond located as shown on Map No. 3 of the Woodmere Realty Company.

"Third. The elevation to which the fill is to be brought, is to be fixed and designated in advance of the work by grade stakes set by the party of the second part; the contractor agrees to bring the fill to within six (6) inches above or below these stakes, with the understanding that there be approximately as much material above the stakes as below them. It is understood that the contractor shall not be obliged to deposit any material at a greater distance than two thousand (2,000) feet from point of excavation, nor excavate at a greater depth than twenty five (25) feet below mean low water. The requirements of this paragraph shall be held to be satisfied by depositing the filling material through pipe lines in the usual way, and no further grading or filling than this shall be required of the contractor.

"Fourth. With reference to levees for impounding material, it is understood and agreed as follows: The levees required to hold the fill on both sides of the canal, to be excavated at the site of the present Mills creek, shall be provided by the owner, and if the owner so desires, the contractor agrees to build these levees for him at cost, plus ten (10) per cent. Any levees that it may be necessary to build along the edge of the marsh on the easterly or bay side, to retain the fill, shall be built by the contractor without charge.

"Fifth. The contractor, at its own expense, and without charge to the owner, will do such dredging as is necessary to bring its plant up the creeks to the yacht club at Woodmere wharf. Beyond such point, the dredging shall be paid for by the owner in accordance with the terms of this contract it be-

ing understood that the material dredged shall be deposited upon the property of the owner.

"Sixth. The owner agrees to pay the contractor for all material excavated and deposited, the sum of nine (9) cents per cubic yard, measured in place in the fill. As it is contemplated to do this work with a hydraulic dredge, this price does not cover the excavation of any rock or other material, impracticable to handle with said dredge, and if any such material be encountered, the contractor shall not be obliged to remove it.

"Seventh. It is understood and agreed that each of the parties hereto will appoint some competent engineer to represent its interests in connection with this contract, and especially for the purpose of determining the quantity of fill placed and transferred to the property of the owner, and

"It is further understood and agreed that in order to determine the amount of settlement, what is known as settlement boards will be provided by the owner and placed by the two engineers jointly at such location, and at such distances as the said engineers may agree upon, and in case of any difference of opinion as to the exact location of said settlement boards, or as to the method of construction, or as to the estimate of the amount of fill placed on the property of the owner, or as to any other point, such matter of difference shall be referred to F. W. Conklin, city surveyor, Far Rockaway, N. Y., as umpire, whose decision in any matter referred to him shall be final and binding upon the parties hereto, and whose fees shall be paid jointly by the parties hereto.

"It is understood and agreed that the settlement boards above referred to are to be put in position by the engineers of the parties hereto, in conjunction with Mr. F. W. Conklin.

"Eighth. Approximate estimates will be made by the engineers of the parties hereto, on or before the 10th day of each month during the progress of the work of the amount of fill placed during the previous month, it being understood and agreed that the quantity of fill is to be determined by the two engineers as hereinbefore provided, and the payments will be made on the said 10th day of each month upon said estimates of the said engineers for the amount and value of the work done, ten (10) per cent. being retained from the amount of all estimate payments. When said payment is made, a certificate is to be furnished by the said engineers to the parties hereto. Said ten (10) per cent. retained shall be due and payable thirty (30) days after the completion of the total contract.

"Ninth. The owner agrees that the contractor shall have free and uninterrupted access to and occupation of the site, together with such other rights and privileges within the power of the owner, necessary for the uninterrupted prosecution of the work; but the owner assumes no risk or liability for damage caused the contractor, should the work contemplated herein be interrupted through the act or acts of the owner or owners of any adjacent lands. Should the execution of this work be interfered with through the act or acts of the owner or owners of any adjacent lands continuously for a period of fifteen days, the contractor shall have the option of cancelling this contract, in which event the accrued reserved percentage, together with all other moneys due the contractor at that time, shall be immediately paid by the owner.

"The owner assumes liability for damages, if any, to the property of other owners, providing said damage is not the result of the negligence of the contractor or its servants, or employés, in which case the contractor shall be liable."

Under this agreement plaintiff began work in the latter part of January, 1910.

In order to hold this semiliquid material, levees were needed. They were built of sod. The original contract gave the defendant the right to have plaintiff build them along the canal upon the basis of cost and 10 per cent. Subsequently to the original contract, it was orally agreed to improve the grounds upon Boorman's Island also. The question of the levees to impound this island fill is disputed. The president of the Woodmere Realty Company maintains that nothing was said about the cost or liability for the Boorman's Island levees.

The levees beside the canal were constructed along lines and stakes mutually agreed upon. The embankments were to set back 25 feet from the cut. Although there was no clause providing for monthly engineer's certificates, the plaintiff's statements of outlays for men and materials were checked off by Mr. Disher and received his O. K., and were the subject of payments made on account by the Woodmere Company. During the progress of the work many of these levees slid out so as to let parts of the fill escape. The cause of this giving way is in dispute. Apparently they were too near the banks of the canal. As they dredged deeper, the stability of the levees was imperiled; and, as more material was deposited, the levees in places could not hold back the fill they had been expected to impound.

Defendant claims that the original cost was excessive; also, that the charges for rebuilding the collapsed levees, and of the sheet piling then resorted to, are a result of faulty construction, all of which should be borne by plaintiff itself. At the beginning of every month measurements of the amount of fill deposited during the preceding month were taken by Mr. Quentin Disher representing Mr. F. W. Conklin. Mr. Conklin, as engineer for the Woodmere Realty Company then signed and certified to the first four monthly estimates. In and after September, 1910, Mr. J. G. Basinger, as engineer for the Woodmere Realty Company, signed the monthly estimates. Estimate No. 5, dated September, 1910, covered the filling operations for August. It indicated some dissatisfaction with the fill in August, in a certain locality, by the following note: "The above statement includes the fill on the area bounded by Rutherford Lane, Marsh Lane, the Canal, the basin and Railroad avenue. The fill on this area is in no way satisfactory to the Woodmere Realty Company, and is not considered up to the desired grade. In including the fill on this area in this estimate, it is distinctly understood and agreed that the Atlantic, Gulf and Pacific Co. will deposit additional fill on this area, and will restore the levees around it, where the same have given way, all to the satisfaction of the Woodmere Realty Company, before the work on this area may be considered completed." The amount called for by this certificate was paid in full. The work continued until December 31, 1910, when the operations stopped for the season. On March 18, 1911, the certified amounts having been in arrears, the plaintiff notified the Woodmere Realty Company that, as its claims had not been paid, it regarded the contract as broken and terminated, whereupon it filed the notice of lien. In this notice it claimed for the unpaid amounts for excavation and filling of the lands, and for an alleged balance due for building and repair of levees.

[1, 2] 1. The Woodmere Company at the outset urges that a decision by Mr. Conklin as umpire, under paragraph 7 of the contract, is a condition precedent to bringing this suit. Mr. Conklin was named to settle differences primarily as to measurements. After this work started, his position changed. Mr. Basinger considered that, as Mr. Conklin was on the ground, it would be needless for another engineer to come from New York to Woodmere and make these measurements, and therefore retained Mr. Conklin as the engineer and local representative of the Woodmere Company. After such employment, which was not contemplated in the contract, Mr. Conklin became disqualified to act as arbitrator. He could not fairly be asked to take such an extraordinary position. Furthermore, there was no difference of opinion on any question of locating the settlement boards, methods of construction, or as to amount of fill; indeed, no dispute of an engineering nature to be submitted. These data had been agreed upon, as shown by the signed estimates from month to month.

[3] 2. Much testimony has been given as to the nature of the fill. Instead of a hard sand or clay fill, it is in parts soft mud such as was dredged from the sediment at the bottom and sides of the canal. It drys out on the land but slowly, so that two years after its deposit the thicker parts are still soft and yielding. Hence those places are unfit for building operations. The extent of these muddy areas is considerable, but the contract had no undertaking as to the nature of the fill. Plaintiff was required to dredge in specific locations to a depth of 25 feet, and deposit this material alongside, regardless of its density, texture, or composition. The canal had to be cut and

opened whether the soil should be mud, clay, or sand. The views of experts and a disclosure of defendant's purpose in entering into this improvement cannot read into this contract a guarantee of the character of the fill to be produced by this dredging. It would be going beyond the court's province to try to substitute a new contract for the instrument that the parties had drawn, and under which they had proceeded without any material controversy until the end of the season. The specification in the September certificate of a part of the fill on the area of Rutherford Lane, Marsh Lane, the canal, the basin, and Railroad avenue as part of the area below grade showed the scrutiny of the Woodmere Company. The plaintiff returned and completed this fill as agreed, even, the second time, extending the pipe line over the 2,000 feet specified in the contract. Thereafter defendant requested no further filling at this place.

3. The levees and cost of replacements were much beyond what the defendant estimated. But it was because the expense could not be figured in advance that the parties agreed on a basis of cost plus 10 per cent. There was nothing peculiar in the construction of sod levees. No question was made as to the proper dimensions of the embankments. The factors apparently not reckoned upon were the soft and yielding character of the ground under the meadows that moved out under the weight of the fill, and the lateral pressure of the fill itself, which was greater because of the proportion of its liquid contents. The giving way of the meadow bottom unsettled the levees and led to expensive replacements. These, however, are ordinary engineering problems. The Woodmere Company as the owner could have learned the stability of the subsoil, or otherwise ascertained how much of a load the surface would carry, and is not entitled to charge the effect of these natural difficulties upon the plaintiff.

[4] Regarding the Boorman Island levees, it is probably true that little was said when the parties undertook to extend the contract so as to include that addition; but the parties went on treating that work as part of the contract, and their practical construction at the time will not be set aside by the court. Although the contract made no provision for monthly certificates and payments, this again was the practical construction of the undertaking. Mr. Disher examined and measured the levees, looked over and checked the items for materials and labor, and appended his certificate to these monthly statements. The contract "at cost and 10 per cent." requires that the contractor shall be repaid the cost and receive his percentage from time to time as the work progresses. Hence these certificates (though not expressly provided for) were in the natural course of such work, and were so received and acted upon.

[5] 4. The question of substantial performance is contested, because the full amount of the contract was not completed, owing to the stoppage of work on December 31, 1910, but the present lien is asserted under a quantum meruit, arising after the refusal to pay the sums called for in the monthly estimates. On December 15th the plaintiff wrote to the Woodmere Company that a part of the region of East Meadows would not then carry a greater load than had been placed thereon, and that further filling should be discontinued till spring. The letter continued: "This will complete all the work contemplated under our contract, as all the other meadows have been brought to the grade established, so far as the material available will permit. We beg to state that our engineers are ready now to make final survey and estimates, and we ask you to immediately proceed with the final survey and estimate, some portions of which have already been completed, with a view to making final payment." Subsequently, on December 30th, the plaintiff completed its work at Woodmere, and closed down its plant upon notice to defendant. Plaintiff then claimed to have completed the entire operation, except the place at East Meadows, that had slid out which was not to be refilled until spring. Defendant's letters made no objection to this position, and did not then express any dissatisfaction with the quality, nature, or extent of the work. The plaintiff pressed for payment of the amount due by the certificates, also for the balances of the levee bills. Delays on various grounds ensued, although plaintiff continued its demands. On March 18th plaintiff was within

its rights in electing to treat this nonpayment as a breach, and to sue upon its quantum meruit for the value of the work performed. Wright v. Reusens, 133 N. Y. 298, 31 N. E. 215; Lawrence Bros. v. Heylman, 89 App. Div. 620, 85 N. Y. Supp. 789.

[6] Much argument has been made as to the effect of the certificates by defendant's engineers, but the points actually presented are not as broad as the propositions of law discussed. The estimates of quantities are not shown to be wrong, or issued under any mistake. The engineers made joint readings of the instruments and therefrom computed the cubic yardage of the work done every month, and these calculations stand unimpaired. Such esti-. mates are ascertainments of quantities and measurements. After they have been acted upon, they stand, unless shown to have been obtained by fraud, accident, or obvious error. Molloy v. Village of Briarcliff Manor, 145 App. Div. 483, 490, 129 N. Y. Supp. 929. Such a certificate is not regarded as determining the rights and obligations under the contract, but as a duly attested agreement as to the quantity of the fill, ascertained by a monthly survey as a pro tanto performance. Nine such certificates over the signature of one of defendant's engineers, showing the cubic yards dredged and deposited at these various dates, are before the court. The December work is in a different form, but is attested by Mr. Basinger in one instance, and by Mr. Conklin in another. By these admissions, made as prescribed in the contract, the quantity thus dredged and deposited amounted to 1,199,160 cubic yards. Until suit brought, the correctness of these figures had not been questioned.

The admissions as to the figures for levee work are also by monthly bills checked by Mr. Disher, and bearing his authentication, presented to defendant, who received and retained them without objection. Mr. Disher's authority, as defendant's engineer in the field, clearly appears, as he was then being paid by defendant indirectly through Mr. Conklin. These certificates, however, are not taken by the court as necessarily conclusive against the defendant as to the construction of the contract, and of the mutual obligation arising under it. They are evidence of an agreement, repeated monthly, as to quantities, and no ground is shown to set aside or overrule such ascertainments by professional experts during the progress of the work.

6. The grade stakes set by defendant bore horizontal cross-pieces, showing the intended height and levels of the surface of the fill. When this fill came within six inches above or below the grade thus established by these grade marks, plaintiff's obligation ceased, and the filling was then continued over a new area. The claim now put forward that, after this procedure had been followed and the ground thus covered, defendant's later measurements show the fill as below grade, is one not contemplated by the contract. A swampy meadow, if not resting on solid subsoil, will settle under the load by such a deposit. Such a subsidence, subsequently found without notice to or participation by the plaintiff, does not disprove the original measurements by levels upon the fill. The decided weight of evidence is that the fill had been made up to the grade stakes (with certain local exceptions, where the grade had been reduced by consent), before the work stopped.

7. A counterclaim is made upon the ground that one of the spillways was negligently placed so as to let the runoff, carrying sediment, flow back into George's Creek; that this shoaled up the passage and stopped the oystermen from getting out to their beds. Of course, the water pumped out had to flow off and run into the bay, and the weight of evidence does not make out any want of care by the plaintiff in the location or management of the spillway.

[7] 8. An additional amount is now claimed by plaintiff for quantity lost by subsidence. It is urged that the monthly figures do not allow for the yielding and instability of the meadow under its new load, and hence that the contents of the fill have been understated. Plaintiff maintains that an average settlement of 20 per cent. was shown at the trial by the defendant's experts. This is but an estimate based upon observations when and after the fill had been superimposed. It is too uncertain to afford a basis for an addi-

tional finding beyond the sum here in suit, so as to warrant amending the complaint.

Judgment is therefore given for $31,978.19, and interest (defendant's counterclaims being dismissed), with costs to the plaintiff.

Argued before JENKS, P. J., and HIRSCHBERG, THOMAS, CARR, and RICH, JJ.

Johnson & Galston, of New York City (James P. Niemann and Clarence G. Galston, both of New York City, of counsel), for appellants.

Russell H. Robbins and John J. Graham, both of New York City, for appellee.

PER CURIAM. Judgment affirmed, with costs, upon the opinion of Mr. Justice Putnam at Special Term.

═══════════

### BARTHOLOMAY BREWERY CO. v. DAVENPORT et al.

(Supreme Court, Appellate Division, Third Department. July 8, 1913.)

FIXTURES (§ 15*)—REMOVAL—FIXTURES SUBSTITUTED BY TENANT.

    Though a bar installed by a tenant is in its nature a trade fixture, yet it having been substituted for an old bar, and consent of the landlord therefor, or preservation of the old one for replacement in removal of the new one, not being shown, the tenant has no right of removal.

    [Ed. Note.—For other cases, see Fixtures, Cent. Dig. §§ 23–29; Dec. Dig. § 15.*]

Appeal from Trial Term, Tioga County.

Action by the Bartholomay Brewery Company against Herman B. Davenport and another. From a judgment for plaintiff, defendant Hanna M. Manning appeals. Reversed, and new trial granted.

See, also, 155 App. Div. 884, 139 N. Y. Supp. 1116.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Charles C. Annabel, of Waverly, for appellant.
Howard & Sebring, of Waverly, for respondent.

SMITH, P. J. This is an action of replevin brought to recover possession of a certain bar and other barroom fittings claimed to have been loaned by respondent to Frank H. Phalen and Leo Whalen in May, 1909. Said last-mentioned parties at that time were the lessees of the appellant Manning, who was and still is one of the owners of the Langford Hotel in the village of Waverly, N. Y. Said lessees thereafter transferred their lease to one Shattuck, and he, in turn, to the defendant Davenport, who was in actual possession of the goods at the time the action was brought. The appellant was made a party defendant by reason of her claim of some interest in or title to the goods. Judgment was demanded for the possession of the chattels, or for the sum of $370 as their value, together with $100 damages for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes